**AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 5515.

United States Court of Appeals First Circuit.

March 22, 1960.

Arthur J. Flamm, Boston, Mass., with whom Segal & Flamm, Boston, Mass., was on brief, for petitioner.

Earle W. Putnam, Attorney, Washington, D. C., with whom Stuart Rothman, General Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Melvin J. Welles, Attorney, Washington, D. C., were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition to review and set aside a decision and order of the National Labor Relations Board dismissing a complaint against the Geilich Tanning Company (hereinafter referred to as the Company).

Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, (hereinafter referred to as Meat Cutters) filed a charge that the Company had engaged in unfair labor practices in violation of Sections 8(a) (1), 8(a) (2), and 8(a) (3) of the National Labor Relations Act, 61 Stat. 136, (1947) as amended, 29 U.S.C.A. § 158(a) (1)–(3). A complaint was issued by the Board alleging that (1) the Company discharged and refused to reinstate employee Reed for the reason that he joined and assisted the Meat Cutters in violation of Section 8(a) (3); (2) that representatives of the Company interrogated and threatened employees concerning their activity on behalf of the Meat Cutters in violation of Section 8(a) (1); (3) that the Company through its officers, agents and representatives, assisted, dominated, contributed to the support of and interfered in the administration of Taunton Leather Workers Union (hereinafter referred to as Leather Workers) in violation of Section 8(a) (2).

A hearing was held before a trial examiner after the Company had denied

each alleged violation. The trial examiner in his intermediate report found that the Company had assisted, dominated, contributed to the support of, and interfered with the administration of the Leather Workers in several respects, the most outstanding of which are: (1) permitting the membership and activity of Company supervisors in the Leather Workers; (2) urging and suggesting, by Simon Geilich, president of the Company, that the supervisors attend and participate in a meeting of the Leather Workers; (3) urging and suggesting at a union meeting, through supervisors William and John Delaney, the renegotiation of an existing 5 year contract between Leather Workers and the Company; (4) participation in by Company officials, and domination by them of a grievance committee meeting. The trial examiner found, in addition, that the dismissal and refusal to reinstate employee Reed was discriminatory and to discourage membership in Meat Cutters. The trial examiner also found that by a warning to Reed by Company vice-president Charles Geilich, and by a warning to employee Joseph Davis by Company superintendent Peterson, as well as by the discharge of Reed, the Company interfered with, restrained, and coerced employees in the exercise of rights guaranteed by Section 7 of the Act.

The Board in its decision entered January 27, 1959 dismissed the complaint on its merits concluding that the General Counsel had not proved by a preponderance of the evidence that the Company had committed any unfair labor practice justifying the issuance of a cease and desist order.[1] The Board, although assuming that the nine disputed foremen were supervisors within the meaning of Section 2(11) of the Act, as found by the trial examiner, held that their membership and activity in the Leather Workers was not sufficient to establish a violation of Section 8(a) (2), and that the suggestion of president Geilich to the foremen of attending the Leather Workers' meeting, and the presence of the Company officials while a vote of the Leather Workers' grievance committee was taken were not sufficient indication of Company domination or interference. The Board also found that with respect to employee Reed, the discharge was for cause and not because of his union activities on behalf of Meat Cutters. The Board, with one member dissenting, concluded that the incidents of threats and coercion found by the trial examiner were isolated incidents and did not warrant the issuance of an order.

Where the trial examiner and the Board disagree in their conclusions, the evidence must be examined with greater care than where both are in agreement. United Fireworks Mfg. Co. v. National Labor Rel. Bd., 6 Cir., 1958, 252 F.2d 428. However, the essential question is still whether substantial evidence supports the Board's findings. Universal Camera Corp. v. National Labor Relations Bd., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Cf. Deepfreeze Appliance Division, Motor Products Corp. v. National Labor Rel. Bd., 7 Cir., 1954, 211 F.2d 458. In the instant case the Board accepted the trial examiner's findings on credibility of witnesses, but concluded in surveying the entire record that, even with these findings on credibility where conflicting testimony existed, the General Counsel had not proved his case. We must, therefore, examine the record with this circumstance in mind and determine whether the Board's conclusions are supported by substantial evidence in the record. See National Labor Relations Bd. v. Universal Camera Corp., 2 Cir., 1951, 190 F.2d 429 (concurring opinion).

We have examined the record with great care. In general we are of the opinion that the findings of the Board are supported by the record. We do not

---

1. The Board found that the trial examiner had displayed a partisan attitude in various respects, but that since the Board on its review of the record found that the General Counsel had not proved his case, the appropriate decision was dismissal of the complaint.

consider it necessary to reiterate all of the events testified to at the hearing and we shall examine in this opinion only the events and inferences from such events that are the principal points in the Board's decision.

█ In relation to the issue of Company interference and domination, the Board assumed that the finding that nine members of the union were supervisors was correct. The Board, however, interpreted the actions of the supervisors, principally William Delaney, in the light of its decision in Nassau and Suffolk Contractors' Association, Inc., 118 N.L.R.B. 174 (1957). In that case the Board ruled that participation in union meetings of minor supervisory employees who were members of the bargaining unit and union was not evidence of interference or domination by the employer, unless the employer had encouraged, authorized, or ratified the activities of such minor supervisory employees, or acted so as to cause the employees to believe that the supervisors were acting on behalf of the employer.[2] The Board refused to hold that the participation of the supervisors involved here at the union meetings was unlawful domination in itself. We believe that there is substantial evidence in the record to support a conclusion that the nine foremen concerned here were only minor supervisory employees, and that application of the doctrine stated in Nassau and Suffolk Contractors' Association, Inc., supra, to their

actions in May and June 1957 was proper.[3]

█ In applying the Nassau doctrine to the activities of William Delaney in particular, the Board concluded that the employees had determined to ask for changes in the contract, and that William Delaney's motion to renegotiate the current contract was only a ministerial act after the employees had made the substantive decision. The Board also found that even assuming, *arguendo*, that William Delaney was one of the leaders for renegotiation, the essential question to be determined was whose interests was he then advancing.[4] On this point the Board stated that when the motion for renegotiation was made at the May 2 meeting, the Meat Cutters had not yet begun their organizing campaign, and therefore any efforts by Delaney to reopen the contract were in the employees' behalf.

The evidence in support of a conclusion that the employees considered a reopening of the current contract prior to William Delaney's motion is somewhat sparse, but we do not find it necessary to decide if there was substantial evidence to support this conclusion.

The Board's conclusion as to the absence of any organizational campaign by the Meat Cutters is sustainable insofar as the record does not contain substantial evidence that the Meat Cutters were on the scene prior to May 2. The only testimony at all related to this question

2. Although it might be reasonable to find that president Geilich's suggestion of attending the union meeting was encouragement of union activity of the supervisors, it was also reasonable to find, from the nature of the testimony by John Silvia, (who came late and got an impression of a "suggestion to attend" but did not himself go to the meeting) and from president Geilich's testimony which the trial examiner apparently relied on as to this point, that this was not prohibited encouragement. Therefore, we shall uphold the Board's application of the Nassau doctrine, which implies such a finding, and the Board's express rejection of any instruction to attend.

3. The nine men who were members of the union were members of the bargaining unit in May and June 1957 in the precise way that the Board contemplated in Nassau and Suffolk Contractors' Association. See id. at 181. The contract in effect at the time of the disputed actions of the nine men expressly includes them in the unit.

4. This question of whose interest Delaney was advancing was relevant to an inference of authorization by the Company. If it was not the Company's interest which was being advanced, then no inference of authorization by the Company and consequent interference and domination could be made.

is Simon Geilich's that "in early spring" his son had seen some Meat Cutters talking to some Company employees.[5] The Board's finding was more emphatic than the state of the record might warrant on strict logical analysis; however, a finding of the presence of the Meat Cutters on the scene was necessary in order to infer any Company advantage in renegotiation, and the record is clear that there was not sufficient support for such finding. Therefore, the Board's conclusion of no domination or interference in regard to this motion of William Delaney was proper.

■ The Board also concluded that the reversal by the grievance committee of its decision to press for Reed's reinstatement was not indicative of Company domination. We believe that the testimony as to statements made to the grievance committee of the Company's position on Reed and also by Leather Workers president Lee constitutes substantial evidence from which the Board could infer that the committee's reversal of position was properly motivated and was not coerced. Whether the presence of Company officials during the voting by show of hands of the grievance committee, as found by the trial examiner, is sufficient, without more, to show employer domination is a question which we believe can best be determined by the Board with its vast experience in dealing with such matters.

In regard to the Board's conclusion that Reed's discharge was for cause and not for his activities on behalf of Meat Cutters, we cannot say that the testimony as to the Company's fear of future liability [6] and the timing of his discharge do not constitute substantial evidence supporting the Board's conclusion.

■ In relation to the Section 8(a)(1) violation, the Board concluded that superintendent Peterson's warning to employee Davis not to talk to Reed was no more than an admonition against excessive talking during working hours. We do not find any support in the record for this conclusion. However, we cannot say that the Board's alternative decision against issuing a cease and desist order on the basis of the two incidents was an abuse of discretion.

■ There is, however, one part of the record that does not support the Board's decision that no violation of the Act was shown requiring a Board order to cease and desist. The June 21, 1957 contract changed the previous contract by excluding "supervisors as defined in the Labor Management Relations Act" from the recognized unit. The 1952 contract had made an exception for employees who were then members of the union; the 1957 contract made no such exception. Since the Nassau doctrine would not apply to the 1957 contract, the participation of the excluded supervisors after June 21, 1957 in union affairs would constitute prima facie interference. The record shows uncontradicted instances of such interference, e. g. the nomination at the January 1958 meeting of employee Lee for union president by William Delaney, with a second by Jeff Hebert, another of the nine men the Board assumes (without deciding) are supervisors. The Board, by so assuming, was faced with the question of their participation under the 1957 con-

5. Elsewhere in the record employee Reed, who was active in seeking union members for the Meat Cutters among Company employees, stated that Charles Geilich, son of the Company president, had seen him with Meat Cutter representatives in late May or early June. It is not irrational to infer that this testimony refers to the incident related by president Geilich. In that case "early spring" affords no real support for a finding that the Meat Cutters were on the scene prior to May 2.

6. The trial examiner dismissed as unmeritorious the ground of fear by the Company of future liability, stating that no claim of *actual* assault with a knife by Reed had been made. The Board's acceptance, as sufficient in law, of the Company's ground for discharge does not seem erroneous in view of the reported altercations involving Reed. Actual assault with a knife by an employee does not seem necessary in order to justify a discharge to avoid future liability.

tract as well as under the 1952 contract. The Board did not consider this continued participation of the nine men.

We shall remand this case to the Board for consideration of the status of the nine men and of any violation of the Act by their participation in union activities after June 21, 1957 and for the entry of an appropriate order.

A decree will be entered setting aside the order of the Board and remanding the case to the Board for further proceedings consistent with this opinion.